IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,      )
                               )
          v.                   )      1:14-CR-322 (JCC)
                               )
RALPH FREEMAN,                 )
                               )
     Defendant.                )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Ralph
Freeman's Motion to Suppress Evidence [Dkt. 28].  For the
following reasons, the motion will be granted and the
Defendant's statements will be suppressed.

**I. Background**

Beginning in April of 2013, federal law enforcement
agents with Homeland Security Investigations ("HSI Agents")
identified an IP address with suspected child pornography files
available for sharing.  After additional investigation, HSI
Agents determined the subject IP address was assigned to a house
in Falls Church, Virginia, where Defendant Ralph Freeman
("Defendant" or "Freeman") resides with his wife and their
children.

On July 30, 2013, HSI Agents executed a federal search
warrant at Freeman's house to search for evidence related to
violations of 18 U.S.C. §§ 2251, 2252, and 2252A, which

criminalizes the production, advertisement, distribution, receipt, and possession of child pornography. During the execution of the search warrant, two HSI Agents interviewed Freeman in an upstairs bedroom. The circumstances surrounding the execution of the search warrant, and the subsequent interview of Freeman by HSI Agents, are now at issue in this motion to suppress.

Over a year later, on September 25, 2014, a federal grand jury indicted Freeman with one count of receipt of child pornography and one count of possession of child pornography. [Dkt. 16.] Freeman appeared with counsel for arraignment on October 2, 2014, entered a plea of not guilty, and requested a trial by jury, which is currently scheduled for November 24, 2014. [Dkt. 22.]

Presently before the Court is Freeman's Motion to Suppress. Freeman asks the Court to preclude all statements he made during the interview with HSI Agents. (Def.'s Mem. in Supp. [Dkt. 29] at 2.) Freeman contends that the statements should be suppressed from use at trial because the statements were taken in violation of his Fifth Amendment right against self-incrimination. (Id.) The Government filed an opposition brief on November 4, 2014, contesting Freeman's arguments. (Gov't Opp'n [Dkt.33].)

The sole issue before the Court is whether the interview of Freeman constituted "custodial interrogation" by law enforcement, and more specifically, whether he was in custody, such that Freeman should have been informed of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The Court conducted an evidentiary hearing on November 13, 2014, and thus, the motion is ripe for disposition. (Hr'g Tr. [Dkt. 39].)

## II. Standard of Review

"A person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by Miranda." United States v. Leshuk, 65 F.3d 1105, 1110 (4th Cir. 1995) (citations omitted); see also Miranda, 384 U.S. at 107 (defining custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."). Consequently, "any statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless prior Miranda warnings have been given." Leshuk, 65 F.3d at 1110; see also Berkemer v. McCarty, 468 U.S. 420, 434-35 (1984).

Initially, the burden of proof is on the defendant who seeks to suppress the evidence. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). However, once the defendant establishes a basis for the motion to suppress, the burden

3

shifts to the Government, which then bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of Miranda warnings. Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Matlock, 415 U.S. 164, 178 (1974).

A person is "in custody" for Miranda purposes when he is formally arrested or questioned under circumstances in which his freedom of action is curtailed "of the degree associated with a formal arrest." Leshuk, 65 F.3d at 1110 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)). To determine whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, Stansbury, 511 U.S. at 322, and determine whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995); see also United States v. Hashime, 734 F.3d 278, 283 (4th Cir. 2013) (internal quotation marks and citations omitted) ("When deciding whether a defendant not under formal arrest was in custody--and thus if the Miranda requirements apply--a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.").

The Court objectively views the totality of the circumstances surrounding the interrogation and asks "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'." United States v. Hargrove, 625 F.3d 170, 178 (4th Cir. 2010) (quoting Stansbury, 511 U.S. at 322 (quoting Berkemer, 468 U.S. at 440)). Facts relevant to this objective custodial inquiry include, but are not limited to: "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant . . . . Also pertinent are the suspect's isolation and separation from family . . . and physical restrictions[.]" Hashime, 734 F.3d at 283 (quoting United States v. Day, 591 F.3d 679, 686 (4th Cir. 2010) (additional citation omitted)).

### III. Analysis

There is no dispute that Freeman was questioned by law enforcement without first receiving the benefit of Miranda warnings. Thus, if Freeman was in custody, then his statements to HSI Agents are inadmissible against him at trial. Hargrove, 625 F.3d at 177 (citing Miranda, 384 U.S. at 444; United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001)).

For the reasons discussed in detail below, the Court finds the Government failed to establish by a preponderance of the evidence that Freeman's statements were not the product of custodial interrogation.  <u>Miranda</u> warnings were required but not given.  Accordingly, the statements will be suppressed and the Government cannot use them at trial.

Two recent Fourth Circuit opinions in <u>Hargrove</u> and <u>Hashime</u> guide this Court's analysis due to their factual similarity with the circumstances in this case.  The analysis in <u>Hashime</u> controls this outcome.

## A. United States v. Hargrove

In <u>Hargrove</u>, between ten and fifteen law enforcement officers executed a search warrant on Hargrove's residence around 6:00 a.m. to search for evidence of federal child exploitation crimes.  625 F.3d at 173-74.  Approximately five officers, some with firearms drawn, "cleared the residence" and secured the individuals inside, which included the suspect, Hargrove, his daughter who was in her 20s, and the daughter's boyfriend.  <u>Id.</u> at 174.  Defendant John Hargrove testified that he entered his living room and was greeted by an officer "with what looked like an M-16 [rifle] . . . pointed straight at [him]."  <u>Id.</u> at 175.  He responded by putting his arms up in the arm and stating, "I'm not armed."  <u>Id.</u> at 174.  When the residence was secured, an FBI Agent informed Hargrove that they

needed to ask him some questions, but "that he was not under arrest and was free to leave the house at any time." Id. Indeed, at the subsequent suppression hearing, the FBI Agents testified that they did not have an arrest warrant for Hargrove, nor did they have any intention of arresting him. Id.

Hargrove agreed to talk with two FBI Agents at his kitchen table, while one other FBI Agent stood in the kitchen doorway without participating in the interview. Id. "Hargrove was not in handcuffs, he was permitted to smoke cigarettes, and at no time did Hargrove ask for the interview to end or protest about any of the questions. Instead, the Agents testified Hargrove was 'polite and cooperative,' answering questions 'at length,' and indicating he was willing to talk further when the interview was finished." Id. Moreover, the Agents testified that Hargrove was "freely moving around" during the interview, even though Hargrove testified that he felt his movement was restricted, "felt he was going to be arrested," and answered the Agents' questions because "he figured he was going to jail, so it didn't make any difference one way or another whether he spoke to the Agents." Id. at 175 (internal quotation marks omitted).

The district court denied Hargrove's motion to suppress the statements finding the interview "was consensual and not custodial in nature," that it took place in the

"comfortable atmosphere" of his kitchen, and that Hargrove's

subjective views were not dispositive, because the outcome

depended instead "on the objective circumstances of the

interrogation." Id. Specifically, Judge Bailey of the Northern

District of West Virginia held:

> Given the testimony of Agents Chance and
> Shumaker, and defendant's own testimony,
> that defendant was not handcuffed at the
> time his statements were made; that the
> agents did not draw their weapons in the
> kitchen; that defendant was told he was not
> under arrest and that he was free to leave;
> and that the conversation that took place
> between the defendant and the agents was
> amicable and nonthreatening in tone, the
> Court finds that defendant was not in
> custody at the time of his interview on
> January 5, 2007 and therefore, not subject
> to the protection of Miranda warnings.

Id. at 175-76. The Fourth Circuit affirmed. Id. at 182.

In finding that Hargrove was not in custody during the

interview, the Fourth Circuit relied primarily on the following

facts to reach the conclusion that there was no level of

"custodial control" beyond the initial entry by the search team:

only two FBI Agents interviewed Hargrove even though ten to

fifteen were on scene; Hargrove was never placed in handcuffs;

the Agents never drew their firearms; the Agents never made any

threats; and the conversation was amicable. Id. at 179-80

(distinguishing the case from United States v. Colonna, 511 F.3d

431 (4th Cir. 2007)). The Court placed particular emphasis on

the Agents' statement that Hargrove "was free to leave."  Id.
"This affirmative statement of being free to leave goes beyond
merely implied permission that the Court in Parker noted was
important to its totality of the circumstances analysis.  Agent
Chance did not simply refrain from telling Hargrove that he was
not free to leave, but he explicitly informed him he could
leave."  Id. at 180 (citations omitted).  While this fact alone
is not outcome determinative, "it is highly probative of
whether, in the totality of the circumstances, a reasonable
person would have reason to believe he was 'in custody.'"  Id.

### B. United States v. Hashime

        Conversely, in Hashime, the Fourth Circuit reversed
Defendant Faisal Hashime's convictions for various child
exploitation offenses, finding Hashime was "in custody" and
consequently, that the failure to read him his Miranda rights
made his statements inadmissible.  734 F.3d at 285.  There,
approximately fifteen to thirty state and federal law
enforcement officials executed a search warrant at 19-year-old
Hashime's parents' home to search for evidence related to child
exploitation crimes.  Id. at 280.  Officials were let into the
house by Hashime's aunt and initially searched and cleared the
house with their guns drawn.  Id.  One officer entered Hashime's
bedroom and pointed a gun at Hashime, who was sleeping and
unclothed at the time.  Id.  After getting out of bed and

putting on boxer shorts, "the officer held Hashime by the arm,
issuing orders to him, and marched him out to the front lawn,
where officers were corralling the other members of his family.
Despite the chilly weather, the Hashime family members were kept
outside, several of them dressed only in their nightclothes."
Id.

After being kept outside for some time until law
enforcement finished searching the house, Hashime's family
members were eventually let back inside, but only by law
enforcement escort, and each were subsequently interrogated
individually.  Id. at 281.  Two law enforcement officers
escorted Hashime to the basement into a small "storage area" and
proceeded to interrogate him for three hours.  Id.  During this
time, Hashime's mother asked for an attorney for her son on
three occasions, but was told she could not see him or interrupt
the interrogation.  Id.  Hashime's mother testified that the
officers told her Hashime was under arrest.  Id.

"At the beginning of the interview, the officers told
Hashime that he did not have to answer their questions and could
leave at any time."  Id.  But the officers also secretly
recorded the interrogation, did not read his Miranda rights
until over two hours into the interrogation, and made statements
that suggested Hashime was under officer control.  Id.  During
the interview, Hashime admitted to possessing child pornography

on his computer and described how he obtained the files.  Id.
This Court denied his motion to suppress, "emphasizing Hashime's
demeanor and tone during this interrogation, his general
familiarity with law enforcement practices, and his apparent
lack of concern with any imminent arrest, [and concluding that
Hashime] was free to leave and . . . believed himself to be free
to leave."  Id.  The Fourth Circuit reversed.

The Fourth Circuit addressed two primary issues to
determine whether Hashime was in custody: first, law
enforcement's conduct and statements to Hashime prior to and
during the interrogation, and second, Hashime's own demeanor and
tone during the interrogation.  Id. at 283.

First, the Court found that law enforcement's "non-
custodial behavior"[1] was "undercut" by statements law enforcement
made during the interview, specifically two statements:

> [1] I need to know, and I need you to be
> completely honest with me here even if
> you're afraid, I don't care if you say I
> don't want to answer that or I'm afraid to
> answer it, but I need to know the truth.
>
> [2] Like I said at the beginning, the search
> warrant we got to kind of keep an eye on you
> . . . . I can't leave you here with nobody
> here.

---

[1] For example, officers stated, "you are free to leave; you are not under
arrest; you don't have to talk to us; you can leave at any time."  Officers
also offered multiple bathroom and coffee breaks, all of which were declined
by Hashime, who was not handcuffed.  The door was open and Hashime was
sitting closest to the open door.  Id.

Id.  The Court also noted that statements by law enforcement that the suspect is "free to leave" and that he "does not have to answer any questions" is highly probative but insufficient on its own to establish non-custodial interrogation.  Id. at 284. The "home setting" was also not dispositive.  Id. ("A suspect 'may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.") (quoting United States v. Craighead, 539 F.3d 1073, 1083 (9th Cir. 2008)).  Instead, the Court analogized the facts in Hashime to United States v. Colonna, 511 F.3d 431 (4th Cir. 2007), which was previously distinguished in Hargrove.  Hashime woke up unclothed with a gun in his face, his house occupied by a large number of law enforcement agents, he was subsequently isolated during his interrogation, and he and his family lost control over their home.  Id.

        Second, the Fourth Circuit also discounted the district court's emphasis on Hashime's calm tone and cooperative demeanor as also not singularly dispositive of custodial interrogation.  Id. at 284-85.  "The subjective views harbored by either the interrogating officers or the person being questioned are irrelevant.  The test, in other words, involves no consideration of the actual mindset of the particular suspect subject to police questioning."  Id. at 285 (quoting J.D.B. v.

12

<u>North Carolina</u>, --- U.S. ---, 131 S. Ct. 2394, 2402 (2011)

(internal quotation marks and citations omitted); <u>see also</u>

<u>United States v. Parker</u>, 262 F.3d 415, 419 (4th Cir. 2001)

("Custody determinations do not depend on the subjective views

of either the interrogating law enforcement officers or of the

person being questioned, but depend instead [on] the objective

circumstances of the interrogation.")).  And even though the

"agents' tone of voice, statements that Hashime was not under

arrest, and offer of multiple breaks" do caution against

custody, ultimately, the Court held that Hashime was in custody

for purposes of <u>Miranda</u>, because his

> house was swarming with federal and state
> agents, he was rousted from bed at gunpoint,
> held with family members and not allowed to
> move unless guarded, and ultimately
> separated from his family and placed in a
> small storage room with two agents where he
> was questioned by investigators . . . who
> stated that he must remain under guard and
> that they needed 'to know the truth' [during
> what was plainly an hours-long
> interrogation].

<u>Hashime</u>, 734 F.3d at 285.

The Court now turns to the totality of the

circumstances surrounding Freeman's interview as established by

testimony and evidence admitted during the evidentiary hearing.

### C. Findings of Fact

"When deciding a motion to suppress, the district

court may make findings of fact and conclusions of law."  <u>United</u>

States v. Hunter, No. 2:12cr124, 2014 WL 5430985, at *3 (E.D.
Va. Oct. 24, 2014) (citing United States v. Stevenson, 396 F.3d
538, 541 (4th Cir. 2005)). "During the hearing, the credibility
of the witness and the weight to be given the evidence, together
with the inferences, deductions and conclusions to be drawn from
the evidence, are all matters to be determined by the trial
judge." Hunter, 2014 WL 5430985, at *3 (internal quotation
marks and citations omitted).

    The following facts were established during the
suppression hearing. Four federal law enforcement agents
testified on behalf of the Government. Freeman and his wife,
mother-in-law, daughter, and son[2] testified on his behalf. As an
initial matter, the Court gives greater weight to the testimony
and credibility of Freeman and his family members, which was
consistent and corroborated. The Court gives less weight, and
in some instances, no weight at all, to the testimony of the
four federal law enforcement officers, which was generally
inconsistent, uncorroborated, and less credible.

    Around 6:00 a.m. on Tuesday July 30, 2013, twenty-one
state and federal law enforcement officials executed a federal
search warrant on Freeman's home. (Hr'g Tr. [Dkt. 39] at 14.)
Some of the officers wore typical police uniforms. (Id. at 117-

---

[2] The parties stipulated to what the son's testimony would be and the Court
accepted this factual proffer.

18.)  Other officers wore blue jeans, tactical pants, t-shirts, and exterior bullet-proof tactical vests with "POLICE" in bold lettering on the front and back.  (Id. at 10, 22, 34, 61, 68.)  At the time of the initial entry, all of the officers had their service handguns drawn, but no officer possessed a rifle or long-barreled firearm. (Id. at 68-69.)

The Freemans have eight children ranging in age from fourteen to twenty-seven years old.  (Hr'g Tr. at 85.)  On the morning of the search, there were nine occupants inside the home: Freeman, his wife, his wife's mother, four sons, one daughter, and one son's friend.  (Id. at 97.)  Some officers remained outside to establish a "perimeter," including Lead HSI Agent Tarrah Romanoff, until the home was safe.  (Id. at 34, 68.)  Before the officers entered, one of the officers knocked on the door.  (Id. at 16, 61.)  Freeman's mother-in-law opened the door and officers rushed into the home.  (Id. at 117.)  The occupants heard yelling, loud noises, and footsteps throughout the home.  (Id. at 99-100, 117, 125, 137.)

Freeman's wife was already awake but still in bed with Freeman before entry occurred.  (Hr'g Tr. at 99.)  After hearing yelling and screaming, Freeman's wife immediately ran from their third-floor bedroom down to the second-floor landing where she could see officers entering the home through the front door with their handguns drawn.  (Id. at 98-99, 101, 137.)  Freeman, who

15

wears a breathing mask for sleep apnea, (id. at 101, 137), was delayed in exiting the bedroom because he had to take off the mask, (id. at 137), which takes between thirty seconds and one minute. (Id. at 137-38.) Officers spread throughout the home to complete the initial "safety sweep" to identify all occupants and clear the home as safe. As officers searched the home room-by-room they encountered the occupants at gunpoint and escorted them to the first-floor living room near the front door. (Id. at 101-102, 127, 133.) All occupants except Freeman were eventually escorted to the living room where several armed law enforcement agents supervised them.[3] (Id. at 102, 119, 127-28.) The family members, all of whom were scared, (id. at 111-12, 121, 128, 130 ("I was scared to stand up or talk.").), were still dressed in immodest sleeping attire, the sons wearing only boxer shorts. (Id. at 103, 129.)

After the house was clear, Lead HSI Agent Romanoff came inside from the perimeter and removed her bullet proof vest. (Hr'g Tr. at 68.) She then addressed all eight occupants in the living room and told them that the officers were there to execute a federal search warrant. (Id. at 69-70, 113-14.) She

---

[3] Without any corroboration, Agent Heidi Lescault testified that family members were first directed to the outside front porch, and then taken into the living room. (Hr'g Tr. at 35-37.) This portion of her testimony was contradicted by the other Government witnesses and Defense witnesses, (see, e.g., id. at 118.), who testified that the family members were never taken to the front porch. Thus, the Court gives this portion of Agent Lescault's testimony no weight.

also told the occupants no one was under arrest, they were free to leave at any time, and they were not required to talk to law enforcement or answer questions. (Id.)

During this sequestration and supervision of family members in the living room, Freeman's encounter with officers on the third floor of the home was completely separate and distinct. After waking up from the initial commotion, Freeman removed his breathing mask and exited the third-floor bedroom wearing an undershirt and thin shorts. (Hr'g Tr. at 137-38, 140.) He was immediately met outside the bedroom by multiple officers charging up the staircase with handguns drawn. (Id. at 138.) The handguns were pointed at Freeman and were equipped with high-power LED lights, which can cause temporary blindness. (Id. at 18-19.) The officers yelled and commanded that Freeman show his hands. (Id. at 11-12, 139.) Freeman complied and raised his hands. (Id. at 139.)

Freeman held a tissue in one hand, which he had used to wipe excess moisture from the sleep apnea mask. (Id.) An unidentified officer knocked the tissue out of Freeman's hand with his handgun.[4] (Id. at 139-40 ("[H]e went, gestured like

---

[4] The Government did not offer any evidence to the contrary. Only HSI Agent Mark Waugh was present during the initial encounter with Freeman outside his bedroom, but Agent Waugh's encounter with Freeman was brief, approximately 15 seconds, before he continued to secure the house and search for evidence. (Hr'g Tr. at 11-13, 17, 27-30.) The Court also finds Agent Waugh's testimony not credible. He testified only from memory, did not take any notes on the raid, and did not remember many details. Therefore, in the face of no

that (indicating), and knocked out of my hand the thing that I had, and I thought he was shooting me. I really thought I was going to be shot (crying).").)  Freeman responded by yelling, "Please, don't shoot."  (Id. at 140.)

At some point between getting out of bed and meeting the officers outside his bedroom, Freeman defecated in his shorts.  (Hr'g Tr. at 140-41, 150.)  Realizing this, but now standing in the hallway with his hands in the air next to an armed officer, Freeman asked to use the bathroom.  (Id. at 140-41.)  With some reluctance, the officer allowed Freeman to go into the bathroom, but kept watch from the open doorway.  (Id. at 141.)  Freeman attempted to inconspicuously clean himself using a towel and water, but needed to change into different clothes.  (Id. at 141-42.)  The officer, still with his handgun drawn, escorted Freeman from the bathroom to his bedroom to change.  (Id. at 142.)  Freeman slowly and deliberately changed his clothes in full view of the officer,[5] who ordered Freeman to keep his hands visible at all times.  (Id.)

After changing into a fresh t-shirt and shorts under the officer's supervision, Freeman was then escorted out of the bedroom back toward the main staircase.  (Hr'g Tr. at 142-43.) He followed an officer down the staircase from the third floor

contradictory evidence, the Court accepts Freeman's version of events.
[5] Again, the officer or officers who had immediate control over Freeman during this initial encounter did not testify at the hearing.  (See id. at 89.) These events were thus established by Freeman's uncontradicted testimony.

18

with his hands in the air to second-floor landing, where he
first encountered Lead HSI Agent Romanoff, who had just come
from the first-floor living room, where the rest of his family
remained.  (Id. at 143.)  From that vantage point, Freeman could
see one daughter sitting in the first-floor living room, but
only briefly before he was escorted into a bedroom on the second
floor.[6]  (Id. at 158.)  Freeman was separated and never joined
the rest of his family in the living room.[7]  (Id. at 102, 105-
106, 110, 119, 143-44, 148.)

        After meeting Freeman on the second-floor landing,
Agent Romanoff and another HSI Agent[8] accompanied Freeman into
his daughter's bedroom on the second floor.  (Hr'g Tr. at 143-
44.)  Freeman sat in an executive office-style chair closest to
the door,[9] (id. at 74, 144), opposite the two HSI Agents.  The

---

[6] Freeman's daughter corroborated this sequence during the hearing. (Hr'g Tr.
at 128-29.)
[7] Notably, the Government's witnesses testified that Freeman was initially in
the living room with his family.  (Hr'g Tr. at 38-39, 57, 61-62, 69.)  This
testimony was adamantly and credibly contradicted by all four defense
witnesses who never saw Freeman in the living room.  The Court gives less
weight to the officers' testimony for the following reasons: the search
warrant was executed over a year ago; none of the officers took notes or
relied on post-search reports, (id. at 19, 56), but instead testified solely
from memory; only Lead HSI Agent Romanoff had any involvement in the actual
investigation of this case, while the other officers were there to purely
support the execution of the search warrant (id. at 47-48, 58) something they
have done in excess of thirty times since then (id. at 20); the officers
could not remember details of the search (id. at 20-21, 56, 64-66); and their
testimony, viewed as a whole, left gaping holes and questions for the Court.
Agent Wooden even admitted his recollection was not great.  Conversely, the
defense witnesses had never previously encountered law enforcement, which
suggests they would be more likely to remember this encounter.  Their
testimony corroborated one another, and in general, they were more credible.
[8] HSI Agent Kimberly Kroemeke also did not testify during the hearing.
[9] Freeman initially testified that he sat on the bed, but suggested he may
have changed seats at the officers' direction.  (Hr'g Tr. at 144.)

19

bedroom contained a bed, two dressers, a book shelf, and three chairs, but no computer media.[10]  (Id.)  Lead Agent Romanoff started the interrogation by advising Freeman of the following: "[Y]ou're not under arrest.  No[] one is under arrest.  You're free to leave at any time, okay.  If you feel like at some point you just don't wanna keep talking with us, that's okay too.  All right." (Interrogation Tr. at 2.)  Before beginning her questioning, Lead Agent Romanoff asked if she could shut the door "just a little bit so it's a little quieter," to which Freeman responded, "Sure. That's fine."  (Id.)  Before the door was closed, Freeman could see officers walking on the second floor, but did not know if an officer was guarding the door once it closed.  (Hr'g Tr. at 94.)

      Unbeknownst to Freeman, the interrogation was secretly recorded.  (Hr'g Tr. at 89-90, 144-45.)  It lasted approximately forty-five minutes.  (Id. at 90.)  Freeman was never handcuffed at any time that morning.  (Id. at 79-80.)  The two HSI Agents did not threaten Freeman nor did they draw or display their handguns during the interrogation, (id. at 80), and their tone was cordial and conversational.  (Id. at 76-77.)  During the interrogation, Freeman admitted to viewing and downloading child pornography using peer-to-peer software, and told agents he had

---

[10] The officers chose this room to interview Freeman because evidence technicians would not interrupt the interrogation looking for computers to seize.  (Id. at 74-75.)

been doing so for five to ten years.  Freeman also directed

agents to the computer where the files would be found.

Throughout the interview, Freeman equivocally mentioned a lawyer

five times.  (See, e.g., Interrogation Tr. at 17 ("I don't

necessarily want to frustrate -- frustrate the situation by

getting a lawyer and turning this into a -- you know, a lawyer

fest."); see also id. at 8, 13, 45.)  Near the end of the

interrogation, Freeman asked the agents if he was free to leave

for work.  (Id. at 50 ("Oh, well, I am getting -- am I not going

to be able to go to work soon?").)  The Agents told him he was

free to go to work, but just as before, an officer remained with

Freeman as he got dressed until he left the home.  (Hr'g Tr. at

81-83, 147.)

During Freeman's interrogation on the second floor of

the home, the family members remained in the first-floor living

room.  (Hr'g Tr. at 103.)  No one in the family had seen Freeman

after the officers had initially entered and secured the house,

(id. at 102, 105-106, 110, 119.), except for one daughter's

glimpse of Freeman as he entered the second-floor bedroom.  (Id.

at 128-29, 158.)  The family members in the living room were

under constant and continuous supervision by law enforcement

officers.  (Id. at 64, 66.)  Freeman's wife, who is hypoglycemic,

needed sustenance from the kitchen at one point, (id. at 106-

107), and other family members needed to use the bathroom or get

water.  (Id.)  At all times, the family members were escorted
and watched by at least one officer as they moved throughout the
first floor of the home.  (Id. at 106-107.)  For example, after
sitting in the living room for some time and realizing she would
be late for work, Freeman's 69 year-old mother-in-law asked an
officer to use the telephone to call her employer.  (Id. at
120.)  The officer responded by stating she was free to leave
for work, (id.), which "shocked" the mother-in-law who, along
with the rest of the family members (id. at 130.), did not think
she was actually free to leave.  (Id. at 104-105, 120.)

      As Freeman's mother-in-law went toward her bedroom,
which is opposite the living room on the first floor, two
officers followed.  (Hr'g Tr. at 120.)  Once inside the bedroom,
the officers shut the doors and proceeded to ask her questions,
which she felt obligated to answer.[11]  (Id. at 120-21.)  After
answering their questions, Freeman's mother-in-law started to
dress, even though one officer remained in the room with her.
(Id. at 121.)  Subsequently, she left the home to go to work.
(Id.)  Freeman, who had gotten dressed on the third floor after
the completion of the interrogation, also left for work.  (Id.
at 132, 147, 166.)  Freeman's wife, who was still sitting in the
living room on the first floor, was surprised to see Freeman and
the mother-in-law leave the home, because she was under the

---

[11] Officers questioned Freeman's wife and other children contemporaneously.

22

impression that no one could leave.  (Id. at 107-108 ("I just thought we were sitting there waiting until they questioned us and finished searching our house.").)  Freeman's wife then asked permission to leave to go to the dentist, which she did.  (Id. at 108.)

Freeman was indicted over a year after the search on two pending child pornography charges.  [Dkt. 16.]

### D. Application

The Court finds that a reasonable person in Freeman's position would not have felt he was free to terminate the interrogation and leave.  Freeman was "in custody" for purposes of Miranda and entitled to warnings.  The Government has failed to prove by a preponderance of the evidence that Freeman's statements were not the product of custodial interrogation, and thus, the motion to suppress will be granted.

As an initial matter, even though the two HSI Agents began the interview by telling Freeman he was "free to leave" and that he did not have to answer their questions, "such a statement is not talismanic or sufficient in and of itself to show a lack of custody."  Hashime, 734 F.3d at 284 (quoting Hargrove, 625 F.3d at 180) (internal quotation marks omitted). Instead, the Court must look at the broader setting, including "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor,

the presence of multiple officers, the potential display of a
weapon by an officer, and whether there was any physical contact
between the officer and the defendant." Hashime, 734 F.3d at
283 (citations omitted). "Also pertinent are the suspect's
isolation and separation from family . . . and physical
restrictions[.]" Id. (citations omitted).

There are some objective factors that weigh against
finding that Freeman was in custody. Freeman was interviewed in
his home and was not handcuffed at any time that day. See,
e.g., United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001)
(finding Miranda warnings not required where defendant was
questioned in her own home without any form of restraint, and
was never told she was not free to leave). The HSI Agents' tone
was conversational, calm, and non-threatening, and they did not
display their weapons during the interrogation. Hashime, 734
F.3d at 285.

But other objective factors outweigh these factors and
require the Court to find Freeman was in custody.

First, like Hashime, the "home setting" of the
interrogation is undercut by law enforcement's complete
occupation of the home. Freeman's "house was swarming with
[twenty-one] federal and state agents[.]" Id. In effect,
Freeman and his family lost control of the home for a
substantial period of time while it was occupied by law

24

enforcement officers.  Id. at 284.  And even though Freeman was never handcuffed, from the moment officers entered, Freeman's movements, and his family members' movements, in their own home were controlled and continuously supervised by at least one armed officer.  As such, a person in Freeman's position at the time of the interrogation "may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search."  Id.; see also Hr'g Tr. at 107 ("I just thought we were sitting there waiting until they questioned us and finished searching our house.").  Like Hashime, "[i]t is little wonder" Freeman was unsure whether he was actually free to leave as he was walking out the door for work, (Hr'g Tr. at 148.), and that his family believed they could not leave the living room until the officers told them they could go.  (Id. at 107 ("No, we did not feel free to leave."); accord Hashime, 734 F.3d at 284.

Moreover, Freeman's interrogation in the small, second-floor bedroom with a closed door, separated from the rest of his family members who were under officer supervision in the first-floor living room is akin to Hashime's interrogation in the small storage room away from his family members, and unlike the interrogation in Hargrove that occurred at the kitchen table.  Freeman was not "freely moving around." Cf. Hargrove, 625 F.3d at 175.  Instead, like Hashime, Freeman was under

constant guard by law enforcement, and "ultimately separated
from his family and placed in a small [bedroom] with two agents
and where he was questioned[.]"  Hashime, 734 F.3d at 285.  This
deprived Freeman "of his freedom of action in a[] significant
way."  Miranda, 384 U.S. at 107.

Second, even though the calm demeanor of the HSI
Agents informs this Court's objective analysis, the nature of
Freeman's behavior and demeanor is not dispositive to "the
inquiry of whether a reasonable person would have felt free to
leave[.]"  Id. at 285 ("Whatever the nature of Hashime's tone
and demeanor, it is not dispositive here of the custodial
inquiry.").  Thus, the Court gives no weight to the fact that
Freeman was initially terrified, such that he defecated in his
shorts upon seeing officers outside his bedroom door.  Nor does
the Court give weight to Freeman's demeanor of relative calm
during the interrogation.  Id. (quoting J.D.B. v. North
Carolina, --- U.S. --- 131 S. Ct. 2394, 2402 (2011) ("[T]he
subjective views harbored by either the interrogating officers
or the person being questioned are irrelevant.  The test, in
other words, involves no consideration of the actual mindset of
the particular suspect subjected to police questioning.")

(internal quotation marks and citations omitted) (additional citations omitted).[12]

Instead, the Court must view the broader setting in which the interrogation took place. Id. at 283. The Court concludes the facts here are practically indistinguishable from those in Hashime. The officers' 6:00 a.m. entry was loud and harrowing for any reasonable person who was inside that home. Within seconds of waking up, Freeman immediately faced several armed officers wearing tactical bulletproof vests rushing up the stairs. Their handguns were drawn and equipped high-powered LED lights, which are powerful enough to disorient or momentarily blind an individual. One officer even used his handgun to knock a napkin out of his hand. From that initial encounter until the moment Freeman left the home, he was under the supervision and control of at least one, if not two, officers at all times. Freeman was separated from his family at all times, and the HSI Agents secretly recorded his interrogation in a closed second-floor bedroom. Aside from the length of the Freeman's interrogation, which was much shorter than Hashime's three-hour long interrogation, Freeman's "house was swarming with federal

_____

[12] To the extent Freeman argues he invoked his right to counsel under the Fifth Amendment (even though it appeared defense counsel abandoned this argument at the evidentiary hearing), the Court finds that Freeman's statements about counsel were ambiguous and not unequivocal requests for an attorney. See,, e.g., Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000) ("I think I need a lawyer."); Mueller v. Angelone, 181 F.3d 557, 573-74 (4th Cir. 1999) ("Do you think I need an attorney here?"). Thus, he never invoked his right to counsel under the Fifth Amendment.

and state agents, he was rousted from bed at gunpoint, held . . . and not allowed to move unless guarded, and ultimately separated from his family and placed in [an upstairs bedroom] with two agents where he was questioned[.]" Id. at 285.

Based on all of these facts, viewed objectively, the Court cannot conclude by a preponderance of the evidence that Freeman's statements were not the product of custodial interrogation. A reasonable person in Freeman's position would not have felt free to leave, or terminate the interrogation.

Thus, the Court concludes Freeman was "in custody" for Miranda purposes. Freeman's statements made during the interrogation without the benefit of Miranda warnings will be suppressed. Leshuk, 65 F.3d at 1110; Berkemer, 468 U.S. at 434-35.

## IV. Conclusion

For the foregoing reasons, the Court will grant Freeman's Motion to Suppress Evidence.

An appropriate Order shall issue.


_____
/s/
November 18, 2014                James C. Cacheris
Alexandria, Virginia        UNITED STATES DISTRICT COURT JUDGE